# THE G. R. BOOTH.

CERTIFICATE FROM: THE CIRCUIT COURT OF APPEALS FOR THE
SECOND CIRCUIT.

No. 10.   Argued December 17, 1897. — Decided October 17, 1898.

A provision in a bill of lading, that the carrier " shall not be liable for loss
or damage caused by the perils of the sea," or by " accidents of naviga-
tion," does not exempt the carrier from liability for damage to part of
the cargo by sea water under these circumstances : While the ship was
being unloaded at the dock in her port of her destination, a case of deto-
nators in her hold exploded, without fault of any one engaged in carrying
or discharging the cargo, and the explosion made a large hole in the side
of the ship, through which the water rapidly entered the hold, and dam-
aged other goods.

Upon an appeal from a decree of the District Court of the
United States for the Southern District of New York, dis-
missing a libel in admiralty by the American Sugar Refining
Company against the steamship G. R. Booth, for damage to
cargo (64 Fed. Rep. 878), the Circuit Court of Appeals certi-
fied to this court the following statement of facts and ques-
tion of law:

" On July 14, 1891, the steamship G. R. Booth, a large sea-
worthy steel vessel, was lying at the dock in the waters of
the harbor of New York, discharging a general cargo, which
had been laden on board at Hamburg for transportation to
and delivery at New York City.   Part of the cargo laden on
board at Hamburg consisted of twenty cases of detonators.

" Detonators are blasting caps used to explode dynamite or
gun-cotton, and consist of a copper cap packed with fulminate
of mercury.   In use, the cap is placed in contact with dyna-
mite; a fuse is pushed into the cap until it meets the packing ;
the fuse is lighted, and when the fire reaches the fulmi-
nate it explodes it, thus exploding the dynamite.   The deto-
nators were made in Germany, and were packed according to
the regulations prescribed by German law, adopted and en-
forced for the purpose of eliminating risk of danger in hand-

ling and transporting them. When thus packed, the immunity from danger of an accidental explosion is supposed to be complete, and they are transported and handled like ordinary merchandise by carriers and truckmen without the use of any special precautions to avoid risk. They do not explode when subjected to violent shock, as when thrown from such a height above the ground as to shatter in fragments the cases in which they are packed. They were customarily stowed and transported in vessels like ordinary merchandise, indiscriminately with the other cargo; and until the present occurrence, although millions of cases had been shipped and carried to all parts of the world, no accident had happened, so far as is known.

" The detonators were stowed with other cargo in afterhold No. 4. While the steamship was being unladen, one of the cases exploded, making a large hole in the side of the ship, in the No. 4 hold, besides doing other damage. In consequence of the opening thus made in the ship's side, sea water rapidly entered in the No. 4 hold, beyond the control of the capacity of the pumps, and passed from the No. 4 hold through the partition into No. 3. hold. In No. 3 hold there was cargo belonging to the libellant, consisting of sugar, which had not as yet been discharged. The sea water thus entering the hold damaged the sugar extensively. The boxes of detonators were stowed and handled in the usual way; and the explosion occurred purely by accident, and without any fault or negligence on the part of any person engaged in transporting them or in discharging the cargo.

" The bill of lading under which the sugar of the libellant was carried contained the following clause: ' The ship or carrier shall not be liable for loss or damage occasioned by the perils of the sea or other waters; by fire, from any cause or wheresoever occurring; by barratry of the master or crew; by enemies, pirates, robbers or thieves ; by arrest and restraint of princes, rulers or people; by explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery or appurtenances; by collision, stranding or other accidents of navigation, of whatsoever kind.'

" Upon these facts the court desires instructions upon the following question of law, viz. : Whether the damage to libellant's sugar caused by the sea water which entered the ship through the hole made in her side by the explosion, without her fault, is a 'loss or damage occasioned by the perils of the sea or other waters,' or by an ' accident of navigation of whatsoever kind,' within the above-mentioned exceptions in the bill of lading."

*Mr. Harrington Putnam* for appellant.

*Mr. J. Parker Kirlin* for appellee.

Mr. Justice Gray delivered the opinion of the court.

This was a libel against the steamship G. R. Booth, for damage done to sugar, part of her cargo, under the following circumstances : Another part of the cargo consisted of twenty cases of detonators, being copper caps packed with fulminate of mercury for exploding dynamite or gun-cotton. While she was being unladen at the dock in her port of destination, one of the cases of detonators exploded, purely by accident, and without any fault or negligence on the part of any one engaged in carrying or discharging the cargo. The explosion made a large hole in the side of the ship, through which the sea water rapidly entered the hold, and greatly damaged the sugar.

The bill of lading of the sugar provides that " the ship or carrier shall not be liable for loss or damage occasioned by the perils of the sea or other waters," or " by collision, stranding or other accidents of navigation, of whatsoever kind."

The question certified by the Circuit Court of Appeals to this court is whether the damage to the sugar is within these exceptions in the bill of lading.

The case turns upon the question whether the damage to the sugar by the sea water which entered the ship through the hole made in her side by the explosion, without her fault, was " occasioned by the perils of the sea " ; or, in other words,

whether it is the explosion, or a peril of the sea, that is to be considered as the proximate cause of the damage, according to the familiar maxim *causa proxima non remota spectatur.*

The many authorities bearing upon this point, fully cited and discussed in the learned arguments at the bar, have been carefully examined. But only a few of them need to be referred to, because judgments heretofore delivered by this court afford sufficient guides for the decision of this case.

In an early case, in which the action was upon a bond, given under the embargo act of December 29, 1807, c. 5, § 2, 2 Stat. 453, to reland goods in some port of the United States, "the dangers of the seas only excepted," the vessel was irresistibly driven by stress of weather into Porto Rico, and the cargo was there landed and sold by order of the governor, with which the master was obliged to comply. It was argued for the United States, that the goods arrived in Porto Rico in safety, and the party had the full benefit of them, and probably at a higher price than if he had landed them in the United States; and that the sea was not the proximate cause of the loss. But this court held that the case was within the exception in the bond, because the vessel, as said by Chief Justice Marshall in delivering judgment, "was driven into Porto Rico, and the sale of her cargo, while there, was inevitable. The dangers of the sea placed her in a situation which put it out of the power of the owners to reland her cargo within the United States. The obligors, then, were prevented, by the dangers of the seas, from complying with the condition of the bond; for an effect which proceeds, inevitably, and of absolute necessity, from a specified cause, must be ascribed to that cause." *United States* v. *Hall,* 6 Cranch, 171, 176.

In *Waters* v. *Merchants' Ins. Co.,* 11 Pet. 213, the Circuit Court certified to this court the question whether a policy of insurance upon a steamboat on the western waters against the perils of the rivers and of fire covered a loss of the boat by a fire caused by the barratry of the master and crew. This question was answered in the negative, for reasons stated by Mr. Justice Story as follows: "As we understand the first

question, it assumes that the fire was directly and immediately caused by the barratry of the master and crew, as the efficient agents; or, in other words, that the fire was communicated, and occasioned by the direct act and agency of the master and crew, intentionally done from a barratrous purpose. In this view of it, we have no hesitation to say, that a loss by fire, caused by the barratry of the master or crew, is not a loss within the policy. Such a loss is properly a loss attributable to the barratry, as its proximate cause, as it concurs as the efficient agent, with the element, *eo instanti*, when the injury is produced. If the master or crew should barratrously bore holes in the bottom of the vessel, and the latter should thereby be filled with water and sink, the loss would properly be deemed a loss by barratry, and not by a peril of the seas or of rivers, though the flow of the water should coöperate in producing the sinking." 11 Pet. 219, 220.

The maxim has been largely expounded and defined by this court in cases of insurance against fire.

In *Insurance Co.* v. *Tweed*, 7 Wall. 44, cotton in a warehouse was insured against fire by a policy which provided that the insurers should not be liable for losses which might "happen or take place by means of any invasion, insurrection, riot or civil commotion, or any military or usurped power, explosion, earthquake or hurricane." An explosion took place in one warehouse, resulting in a conflagration which spread to a second warehouse, and thence, in the course of the wind blowing at the time, to a third warehouse containing the insured cotton. This court held that the loss of the cotton was caused by the explosion, and therefore the insurer was not liable; and, speaking by Mr. Justice Miller, said: "The only question to be decided in the case is, whether the fire which destroyed plaintiff's cotton happened or took place by means of the explosion; for if it did, the defendant is not liable by the express terms of the contract. That the explosion was in some sense the cause of the fire is not denied, but it is claimed that its relation was too remote to bring the case within the exception of the policy. And we have cited to us a general review of the doctrine of proximate and remote causes,

as it has arisen and been decided in the courts in a great variety of cases." "One of the most valuable of the criteria furnished us by these authorities is to ascertain whether any new cause has intervened between the fact accomplished and the alleged cause. If a new force or power has intervened, of itself sufficient to stand as the cause of the misfortune, the other must be considered as too remote. In the present case, we think there is no such new cause. The explosion undoubtedly produced or set in operation the fire which burned the plaintiff's cotton. The fact that it was carried to the cotton by first burning another building supplies no new force or power which caused the burning. Nor can the accidental circumstances that the wind was blowing in a direction to favor the progress of the fire towards the warehouse be considered a new cause." "We are clearly of opinion that the explosion was the cause of the fire in this case." 7 Wall. 51, 52. In that case, as has been since observed by Mr. Justice Strong in delivering judgment in a case to be presently referred to more particularly, "it was, in effect, ruled that the efficient cause, the one that set others in motion, is the cause to which the loss is to be attributed, though the other causes may follow it and operate more immediately in producing the disaster." *Insurance Co.* v. *Boon*, 95 U. S. 117, 131.

In *Insurance Co.* v. *Transportation Co.*, 12 Wall. 194, a large steamboat on Long Island Sound was insured against fire, excepting fire happening "by means of any invasion, insurrection, riot or civil commotion, or of any military or usurped power." The facts, as found by the Circuit Court and stated in the report, were as follows: Another vessel came into collision with the steamboat, striking her on the side, and cutting into her hull below the water line, in consequence of which she immediately and rapidly began to fill with water. Within ten or fifteen minutes after the collision, the water reached the floor of her furnace, and generated steam which blew the fire against her woodwork, whereby her upper works were enveloped in flames, and continued to burn for half or three quarters of an hour, when she rolled over and gradually sank in twenty fathoms of water. From the effects of the collision alone,

she would not have sunk below her promenade deck, but would have remained suspended in the water, and could have been towed to a place of safety, and repaired at an expense of $15,000. The sinking of the steamboat below her promenade deck was the result of the action of the fire in burning off her upper works, whereby her floating capacity was decreased and she sank to the bottom, and the amount of the additional damage thereby caused, including the cost of raising her, was $7300. Upon that state of facts, the court, affirming the judgment of the Circuit Court, held the insurers liable for the latter sum. But in the opinion of this court, delivered by Mr. Justice Strong, the rule was recognized and affirmed, that " when there is no order of succession in time, when there are two concurrent causes of a loss, the predominating efficient one must be regarded as the proximate, when the damage done by each cannot be distinguished." And it was added, " And certainly that cause which set the other in motion, and gave to it its efficiency for harm at the time of the disaster, must rank as predominant." 12 Wall. 199. The rule was held to be inapplicable to that case, because the damage resulting from the fire, and that caused by the collision, apart from the fire, were clearly distinguished; and because the policy, exempting the insurers from liability for losses by fire by certain specified causes, covered losses by fire from all other causes, including collisions. But for those distinctions, the decision could hardly be reconciled with the earlier opinions already referred to, or with that delivered by the same able and careful judge in the later case of *Insurance Co.* v. *Boon,* 95 U. S. 117.

In *Insurance Co.* v. *Boon,* a policy of insurance against fire, issued during the war of the rebellion, for one year, upon goods in a store in the city of Glasgow in the State of Missouri, provided that the insurers should not be liable for " any loss or damage by fire which may happen or take place by means of any invasion, insurrection, riot or civil commotion, or of any military or usurped power." The city of Glasgow, being occupied as a military post by the United States forces, was attacked by a superior armed force of the rebels and defended by the

United States forces; and during the battle the commander of these forces, upon its becoming apparent that the city could not be successfully defended, and, in order to prevent military stores, which had been placed in the, city hall, from falling into the hands of the rebels, caused them to be destroyed by burning the city hall; and the fire, spreading from building to building, through three intermediate buildings, to that containing the goods insured, destroyed them. This court held that the loss was within the exception in the policy, because the rebel military power was the predominating and operating cause of the fire; and in the opinion of the court, delivered by Mr. Justice Strong, and strongly supported by authority, the true rule and its application to that case were stated as follows:

"The question is not what cause was nearest in time or place to the catastrophe. That is not the meaning of the maxim *causa proxima non remota spectatur*. The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, though they may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster." 95 U. S. 130. "The conclusion is inevitable, that the fire which caused the destruction of the plaintiffs' property happened or took place, not merely in consequence of, but by means of, the rebel invasion and military or usurped power. The fire occurred while the attack was in progress, and when it was about being successful. The attack, as a cause, never ceased to operate until the loss was complete. It was the *causa causans* which set in operation every agency that contributed to the destruction. It created the military necessity for the destruction of the military stores in the city hall, and made it the duty of the commanding officer of the Federal forces to destroy them. His act, therefore, in setting fire to the city hall, was directly in the line of the force set in motion by the usurping power." 95 U. S. 132. "The court below regarded the action of the United States military authorities as a sufficient cause inter-

vening between the rebel attack and the destruction of the plaintiffs' property, and therefore held it to be the responsible proximate cause. With this we cannot concur. The proximate cause, as we have seen, is the dominant cause, not the one which is incidental to that cause, its mere instrument, though the latter may be nearest in place and time to the loss. In *Milwaukee. & St. Paul Railway* v. *Kellogg*, 94 U. S. 469, we said, in considering what is the proximate and what the remote cause of an injury, ' The inquiry must always be whether there was any intermediate cause, *disconnected from the primary fault*, and self-operating, which produced the injury.' In the present case, the burning of the city hall and the spread of the fire afterwards was not a new and *independent* cause of loss. On the contrary, it was an incident, a necessary incident and consequence, of the hostile rebel attack on the town — a military necessity caused by the attack. It was one of a continuous chain of events brought into being by the usurped military power — events so linked together as to form one continuous whole." 95 U. S. 133.

In general accord with the opinions above quoted are two cases in this court upon the meaning and effect of the term "dangers of navigation," or " perils of the sea," in a bill of lading. *The Mohawk*, 8 Wall. 153 ; *The Portsmouth*, 9 Wall. 682.

In *The Mohawk*, a steamboat, carrying wheat under a bill of lading containing an exception of "dangers of navigation," grounded on the flats, and, in the effort to get her off, became disabled by the bursting of her boiler, and afterwards sank. It was argued, among other things, on the one side, that the explosion was not a danger incident to navigation; and, on the other, that the sinking of the vessel was the immediate cause of the damage to the wheat. The question at issue was whether the vessel was entitled to freight *pro rata itineris.* This court, speaking by Mr. Justice Nelson, said that "the explosion of the boiler was not a peril within the exception of the bill of lading," and therefore the case fell within that class in which the ship is disabled or prevented from forwarding the goods to the port of destination by a peril or accident not

within the exception in the bill of lading. 8 Wall. 162. Although this statement was perhaps not absolutely necessary to the decision, it was upon a point argued by counsel, and shows clearly that the court was of opinion that the explosion, and not the sinking, was the proximate cause of the loss.

In *The Portsmouth*, it was decided that a jettison made to lighten a steamboat, which had been run aground by her captain's negligence, was not within an exception of " the dangers of lake navigation " in a bill of lading ; and Mr. Justice Strong, in delivering judgment, said: " A loss by a jettison occasioned by a peril of the sea is, in ordinary cases, a loss by perils of the sea. But it is well settled that, if a jettison of a cargo, or a part of it, is rendered necessary by any fault or breach of contract of the master or owners of the vessel, the jettison must be attributed to that fault, or breach of contract, rather than to the sea peril, though that may also be present, and enter into the case. This is a principle alike applicable to exceptions in bills of lading and in policies of insurance. Though the peril of the sea may be nearer in time to the disaster, the efficient cause, without which the peril would not have been incurred, is regarded as the proximate cause of the loss. And there is, perhaps, greater reason for applying the rule to exceptions in contracts of common carriers than to those in policies of insurance, for, in general, negligence of the insured does not relieve an underwriter, while a common carrier may not, even by stipulation, relieve himself from the consequences of his own fault." 9 Wall. 684, 685.

Generally speaking, the words " perils of the sea " have the same meaning in a bill of lading, as in a policy of insurance. There is a difference, indeed, in their effect in the two kinds of contract, when negligence of the master or crew of the vessel contributes to a loss by a peril of the sea ; in such a case, an insurer against " perils of the sea " is liable, because the assured does not warrant that his servants shall use due care to avoid them ; whereas an exception of " perils of the sea " in a bill of lading does not relieve the carrier from his primary obligation to carry with reasonable care, unless prevented by the excepted perils. But when, as in the present case, it is

distinctly found that there was no negligence, there is no reason, and much inconvenience, in holding that the words have different meanings in the two kinds of commercial contract. *The Portsmouth*, above cited ; *Phœnix Ins. Co.* v. *Erie Transportation Co.*, 117 U. S. 312, 322–325 ; *Liverpool Steam Co.* v. *Phœnix Ins. Co.*, 129 U. S. 397, 438, 442 ; *Compania La Flecha* v. *Brauer*, 168 U. S. 104; *The Xantho*, 12 App. Cas. 503, 510, 514, 517.

In the case at bar, the explosion of the case of detonators, besides doing other damage, burst open the side of the ship below the water line, and the sea water rapidly flowed in through the opening made by the explosion, and injured the plaintiff's sugar. The explosion, in consequence of which, and through the hole made by which, the water immediately entered the ship, must be considered as the predominant, the efficient, the proximate, the responsible cause of the damage to the sugar, according to each of the tests laid down in the judgments of this court, above referred to. The damage to the sugar was an effect which proceeded inevitably, and of absolute necessity, from the explosion, and must therefore be ascribed to that cause. The explosion concurred, as the efficient agent, with the water, at the instant when the water entered the ship. The inflow of the water, seeking a level by the mere force of gravitation, was not a new and independent cause but was a necessary and instantaneous result and effect of the bursting open of the ship's side by the explosion. There being two concurrent causes of the damage — the explosion of the detonators, and the inflow of the water — without any appreciable interval of time, or any possibility of distinguishing the amount of damage done by each, the explosion, as the cause which set the water in motion, and gave it its efficiency for harm at the time of the disaster, must be regarded as the predominant cause. It was the primary and efficient cause, the one that necessarily set the force of the water in operation ; it was the superior or controlling agency, of which the water was the incident or instrument. The inflow of the sea water was not an intermediate cause, disconnected from the primary cause, and self-operating ; it was not a new and independent cause

of damage; but, on the contrary, it was an incident, a necessary incident and consequence, of the explosion; and it was one of a continuous chain of events brought into being by the explosion — events so linked together as to form one continuous whole.

The damage was not owing to any violent action of winds or waves, or to the ship coming against a rock or shoal or other external object; but it was owing to an explosion within the ship, and arising out of the nature of the cargo, which cannot be considered, either in common understanding, or according to the judicial precedents, as a peril of the sea.

As was observed by this court in *Insurance Co.* v. *Boon*, above cited, " Often, in case of a fire, much of the destruction is caused by water applied in efforts to extinguish the flames; yet, it is not doubted, all that destruction is caused by the fire, and insurers against fire are liable for it." 95 U. S. 131. If damage done by water thrown on by human agency to put out a fire is considered a direct consequence of the fire, surely damage done by water entering instantly, by the mere force of gravitation, through a hole made by an explosion of part of the cargo, must be considered as a direct consequence of the explosion.

Upon principle and authority, therefore, our conclusion is that the explosion, and not the sea water, was the proximate cause of the damage to the sugar, and that this damage was not occasioned by the perils of the sea, within the exceptions in the bill of lading.

Nor can the damage to the sugar, attributable, not to a peril of the sea, but to the explosion of part of the cargo after the ship had ended her voyage, and had been finally and intentionally moored at the dock, there to remain until her cargo was taken out of her, be considered as " occasioned by accidents of navigation." *Canada Shipping Co.* v. *British Shipowners' Association*, 23 Q. B. D. 342; *The Accomac*, 15 Prob. Div. 208; *Thames & Mersey Ins. Co.* v. *Hamilton*, 12 App. Cas. 484; *The Mohawk*, above cited.

Much reliance was placed by the appellee upon a recent English case, in which the House of Lords, reversing the de-

cision of Lord Esher and Lords Justices Bowen and Fry in the Court of Appeal, and restoring the judgment of Lord Justice Lopes in the Queen's Bench Division, held that damage to goods by sea water which, without any neglect or default on the part of the shipowners or their servants, found its way into the hold of a steamship through a hole which had been gnawed by rats in a leaden pipe connected with the bath room of the vessel, was within the exception of "dangers or accidents of the seas" in a bill of lading. *Hamilton* v. *Pandorf*, 12 App. Cas. 518; 17 Q. B. D. 670; 16 Q. B. D. 629. There is nothing in the report of any stage of that case to show that the sea water entered the ship immediately upon the gnawing by the rats of the hole in the pipe; and any such inference would be inconsistent with one of the opinions delivered in the House of Lords, in which Lord Fitzgerald said: "The remote cause was in a certain sense the action of the rats on the lead pipe; but the immediate cause of the damage was the irruption of sea water from time to time through the injured pipe, caused by the rolling of the ship as she proceeded on her voyage." 12 App. Cas. 528. However that may have been, that case differs so much in its facts from the case now before us, that it is unnecessary to consider it more particularly.

*Question certified answered in the negative.*