## THE ZULIA.

### (District Court, E. D. New York. May 29, 1916.)

1. **SHIPPING ⬅132(3)—LIABILITY FOR DAMAGE TO CARGO—BURDEN OF PROOF.**
The burden of proof to show that damage to cargo after it had been delivered to the ship was from a cause within an exception in the bills of lading rests on the carrier.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 479–481; Dec. Dig. ⬅132(3).]

2. **SHIPPING ⬅122—LIABILITY FOR DAMAGE TO CARGO—NEGLIGENCE OF STEVEDORE.**
As between shipper and carrier, a stevedore, although an independent contractor, is a servant of the shipowner, for whose negligence, resulting in damage to the cargo, he is responsible.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 452, 453, 456, 457; Dec. Dig. ⬅122.]

3. **SHIPPING ⬅141(3)—LIABILITY FOR DAMAGE TO CARGO—PERILS OF THE SEA.**
Damage to cargo, which had been loaded, by reason of the slipping of a heavy steel rod from the sling while being lowered through a hatchway, which broke through the bottom and caused the sinking of the ship, was not from a peril of the sea, within an exception in the bills of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 498; Dec. Dig. ⬅141(3).]

4. **SHIPPING ⬅141(1)—LIABILITY FOR DAMAGE TO CARGO—EXCEPTIONS IN BILLS OF LADING.**
Neither is such damage within exceptions relieving the carrier from liability for damage caused by "dangerous goods shipped without full disclosure of their nature," or by "insufficiency of packages"; the shipowner and stevedore having full knowledge of the nature of the shipment and method of packing.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493, 497, 499; Dec. Dig. ⬅141(1).]

5. **SHIPPING ⬅138—LIABILITY FOR DAMAGE TO CARGO—HARTER ACT.**
Damage resulting to cargo while the vessel is being loaded at her pier is not damage resulting from "faults or errors in navigation or in the management of the vessel," within the exemption of Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (Comp. St. 1913, § 8031).

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. ⬅138.]

6. **NEGLIGENCE ⬅121(2)—ACTIONS FOR NEGLIGENCE—EVIDENCE—RES IPSA LOQUITUR.**
When a thing which causes damage is under the exclusive control of a person, and the occurrence is such as in the ordinary course of things does not happen if the person having such control uses proper care, it affords

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

reasonable evidence, in the absence of explanation, that the damage arose from that person's want of care.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 218, 225, 271; Dec. Dig. ☞121(2).]

7. SHIPPING ☞132(5)—LIABILITY FOR DAMAGE TO CARGO—NEGLIGENCE IN LOADING.

A shipper of a number of steel drill stems for oil wells, each 35 feet long and weighing 3,500 pounds, packed each in a wooden box. The loading was under the joint management of the shipowner and a contracting stevedore. In loading, one of the rods broke through the end and slipped from the box. Thereafter a portion of the box was cut away, so that the hoisting chains could grip the rod, and a block, called a "preventer," was also attached to one end of the box to prevent it from breaking out. However, one of the rods slipped from the sling while being lowered through the hatch, and broke a hole in the bottom of the ship, causing it to sink and other cargo to be damaged. *Held*, that the shipper was not liable because of the manner of boxing, which was usual and also known to the shipowner and stevedore, and that on the evidence the stevedore was not chargeable with negligence which would exonerate the shipowner from liability for the damage to other cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 483, 484; Dec. Dig. ☞132(5).]

In Admiralty. Suits by the Transatlantische Güterversicherungs Gesellschaft, in Berlin, by Laura Moore (two cases), and by Edward A. Meyer and others against the steamship Zulia (the Atlantic & Caribbean Steam Navigation Company, claimant), with the F. & J. Auditore Company, Incorporated, and the Caribbean Petroleum Company, im · pleaded. Decree for libelants against the claimant alone.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, of New York City, of counsel), for libelants.

Kirlin, Woolsey & Hickox, of New York City (J. Parker Kirlin, John M. Woolsey, and George W. Prettyman, all of New York City, of counsel), for claimant-petitioner.

Cass & Apfel, of New York City (Alvin C. Cass, of New York City, of counsel), for respondent F. & J. Auditore & Co., Inc.

Burlingham, Montgomery & Beecher, of New York City (Roscoe H. Hupper and Norman B. Beecher, both of New York City, of counsel), for respondent Caribbean Petroleum Co.

VEEDER, District Judge. These libels are brought to recover damage to cargo by sea water in the sinking of the steamship Zulia, on December 8, 1913, at Pier 11, Pierrepont street, Brooklyn, N. Y., while she was being loaded with cargo by the F. & J. Auditore Company, Incorporated, a contracting stevedore, impleaded by petition. The stevedore was engaged at the time in taking on board a case or box 35 feet long containing an iron shaft weighing 3,500 pounds, which was part of an equipment of an oil well shipped by the Caribbean Petroleum Company, one of the respondents impleaded by petition. When the shaft in its box was suspended over No. 2 hatch of the steamship, the shaft slipped out of the box and sling into the hold, tearing a hole in the bottom of the steamship and causing her to sink.

The loss complained of relates to cargo which had been loaded prior to this event.

There are four parties before the court in this litigation: The inno-cent cargo owners, hereinafter called the libelants; the steamship Zulia and her owner, hereinafter called the shipowner; F. & J. Auditore Company, Incorporated, contracting stevedore, hereinafter called the stevedore; and the Caribbean Petroleum Company, the shipper of the shaft which caused the damage, hereinafter called the shipper.

The bills of lading had not been issued for the cargo at the time of the accident, but dock receipts had been delivered to the several ship-pers, which would have been exchanged in regular course of business for a line bill of lading of the Red D Line, the trade-name under which the claimant operated the steamship Zulia. This receipt contained the following provision:

"No responsibility being assumed while awaiting loading for loss or damage by flood, fire, strikes, boycott or any other cause specified in the Red D Line steamship's bill of lading, which is hereby made part hereof."

The Red D Line bill of lading contained the following clauses:

"That the carrier shall not be liable for loss or damage occasioned by perils of the sea or other waters, * * * by any latent defect in hull or machin-ery or appurtenances or unseaworthiness of the steamer, whether existing at the time of shipment or at the beginning of the voyage, provided the owners have exercised due diligence to make the steamer seaworthy, * * * rust, * * * or any loss or damage arising from the nature of the goods or in-sufficiency of packages."

"That shippers shall be liable for any loss or damage to steamer or cargo caused by * * * dangerous goods shipped without full disclosure of their nature, whether such shipper be principal or agent."

It was alleged in the answers and petitions in the several cases that the case of shafting, above mentioned, was by reason of its weight, the improper nature and construction of the case or box in which it was packed, and by reason of the fact that the shafting or pipe was not properly secured in the box, "dangerous goods" within the meaning of the bill of lading clause. It was further pleaded that, inasmuch as the box or shafting was shipped without full disclosure to the ship, her owner or agents, of the danger involved in its handling, the shipper was responsible for any damage caused by the shaft.

The Harter Act was also pleaded, to the effect that a steamer prop-erly manned, equipped, and supplied is not liable for losses resulting from faults or errors in navigation or management thereof, or for losses arising from—

"dangers of the sea or other navigable waters, * * * or the inherent de-fect, quality, or vice of the thing carried, or from insufficiency of package, * * * or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative."

It appears from the evidence that the shaft in question was 35 feet in length, 6 inches in diameter throughout its main length, and weighed 3,500 pounds. For some space at both ends the diameter of the shaft was $8\frac{1}{4}$ inches. As delivered on the dock for shipment, it was in-closed in a wooden box made of 2-inch material, with 2-inch end pieces secured by 20-penny nails 4 or 5 inches long. At the ends and at reg-

ular intervals along its length the box was reinforced with metal bands. As packed the 8¼-inch ends fitted snugly in the interior of the box. Apparently the shaft was 2 inches shorter than the interior length of the box. This shaft was one of 16 which had been supplied by another company on an order from the shipper for "16 drill stems properly packed for sea shipment." They were delivered at the Red D Line dock without ever having been seen by the shipper.

The stevedore proceeded to load the packages by means of a chain around the box. By means of the ship's winch the boxes were first dragged up a gangway, then suspended over the hatch, and finally tilted and lowered through the hatch into the steamer's hold. In this method of loading, the box was relied upon for support, and when the package was suspended over the hatch the weight of the shaft was thrown upon the lower end piece. When the third package was being lowered in this way into the hold, the end piece gave way and the shaft slipped out of the box. Thereupon, after an investigation by the stevedore and the shipowner's pier superintendent, a new method of operation was employed by the stevedore. About a third of the distance from one end of the box the covering was cut away for a considerable space; that is, within such space two of the four sides of the box were entirely removed, as were also half the width of the remaining two sides. This left the parts of the box above and below this point connected only by the remaining triangular strip of one corner of the box. Two pieces of wood were laid upon the surface of the exposed portion of the shaft, and then a chain was wound around the shaft and box at this point. At the end of the box farthest removed from the place where the box covering had been cut away, a heavy wooden block, called a "preventer," substantially the width of the bottom of the box, and extending beyond the end on two sides, was secured by heavy ropes leading up to and fastened upon the chain around the shaft. By means of a tackle secured to the chain the package was then dragged up the inclined skid or gangway, suspended over the hatch, tilted, and lowered into the hold. In this method of operation, when the package was lowered through the hatch, the weight of the shaft was substantially thrown upon the preventer at the lower end. The only additional support was dependent upon the possible grip of the chain around the shaft. In this way five more of these packages were safely loaded. When the sixth was being lowered through the hatch, the shaft somehow got free, ran out of the lower end of the box and off the preventer, stove a hole in the bottom of the ship, and caused her to sink. In the fall the box was broken in two pieces at the point where it had been cut into, but nothing else gave way; the chain, ropes, and preventer were all intact. There was no direct proof of the cause of the mishap. None of the witnesses actually saw the whole operation.

[1] First in order of consideration comes the case of the libelants. It is admitted that the shipowner is a common carrier, and that libelants' goods were damaged while in its custody. Under these circumstances the only question to be determined as between the libelants and the shipowner is whether the case falls within any of the

exceptions in the bill of lading. The burden of showing that the damage arose from one of the excepted causes is upon the carrier. The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748.

[2] Of the three exceptions relied upon by the shipowner, the first is that the loss in this case resulted from a peril of the sea. In the consideration of this question the libelants are in no way concerned with any question of negligence on the part of the stevedore. The loading of the cargo is a duty which the shipowner is bound to perform as part of the contract of carriage. Consequently, it is wholly immaterial to the shipper whether the shipowner performs this duty through its own general employés or through an independent contractor. The shipper's contract is with the shipowner; so far as he is concerned the stevedore is the servant of the ship.

[3] It is unnecessary to attempt to define a peril of the sea. Each case must be determined upon its own facts. It does not seem to me that the shipowner's contention derives any substantial support from the English authorities. In any event the decision of the Supreme Court in the case of The G. R. Booth, 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234, is conclusive of this issue. In that case it appears that a steamer was lying at a dock in the harbor of New York, discharging a general cargo which consisted in part of several cases of detonators. Without any negligence on the part of any one concerned in the transportation or discharging of the cargo, one of the cases of detonators exploded, tearing a hole in the side of the ship, in consequence of which water rushed into the ship and caused extensive damage to other cargo. An action was brought by the consignee of a quantity of sugar which was on board the vessel. The bill of lading under which the sugar was carried contained a provision that the carrier should not be liable "for loss or damage occasioned by the perils of the sea or other waters." The court, after an exhaustive review of the authorities, held that the loss did not fall within the exception, saying:

"The explosion, in consequence of which, and through the hole made by which, the water immediately entered the ship, must be considered as the predominant, the efficient, the proximate, the responsible cause of the damage to the sugar, according to each of the tests laid down in the judgments of this court, above referred to. The damage to the sugar was an effect which proceeded inevitably, and of absolute necessity, from the explosion, and must therefore be ascribed to that cause. The explosion concurred, as the efficient agent, with the water, at the instant when the water entered the ship. The inflow of the water, seeking a level by the mere force of gravitation, was not a new and independent cause but was a necessary and instantaneous result and effect of the bursting open of the ship's side by the explosion. There being two concurrent causes of the damage—the explosion of the detonators, and the inflow of the water—without any appreciable interval of time, or any possibility of distinguishing the amount of damage done by each, the explosion, as the cause which set the water in motion, and gave it its efficiency for harm at the time of the disaster, must be regarded as the predominant cause. It was the primary and efficient cause, the one that necessarily set the force of the water in operation; it was the superior or controlling agency, of which the water was the incident or instrument. The inflow of the sea water was not an intermediate cause, disconnected from the primary cause, and self-operating; it was not a new and independent cause of damage; but, on the contrary, it was an incident, a necessary incident and consequence, of the ex-

plosion; and it was one of a continuous chain of events brought into being by the explosion—events so linked together as to form one continuous whole."

According to the recent English case of Stott (Baltic) Steamers, Ltd., v. Marten, [1914] 3 K. B. 1262, it cannot be said that:

"Merely because the recipient of goods is a thing which is going to engage, or if you please is at the moment engaged, in a marine adventure, the fact that she is injured by putting goods on board is a peril of the sea."

It is settled in this country by the case of The G. R. Booth, supra, that if the predominant cause is not in itself a peril of the sea, the simultaneous entry of sea water does not make it such.

[4] The shipowner's contentions that the damage was caused by "dangerous goods shipped without full disclosure of their nature," or "arose from insufficiency of packages," are obviously untenable. It would involve a violent construction of the language quoted to say that an ordinary steel shaft inclosed in a wooden box comes under the head of dangerous goods. Even if it could be so construed, there was in this instance a full disclosure, inasmuch as the shipowner and the stevedore were fully aware of the nature of the shipment and of the method of packing before the accident occurred. With respect to insufficiency of packages, it is sufficient to point out that this provision obviously refers to the insufficiency of the packages which contain the goods damaged. But I may also refer to my conclusion, infra, that the character of the package containing the shaft was not a cause which contributed to the sinking of the steamer.

[5] The shipowner's final contention is that, inasmuch as the Zulia was seaworthy and in all respects properly manned, equipped, and supplied, the libelants' damage, if due to any fault, was "damage or loss resulting from faults or errors in navigation or in the management of said vessel," and therefore the shipowner is exempt from liability under section 3 of the Harter Act. In view of the conclusion at which I have arrived that the evidence does not disclose any fault, this contention need not be discussed in detail. But it may be pointed out that it is disposed of by what the Supreme Court said in the case of The Germanic, 196 U. S. 589, 25 Sup. Ct. 317, 49 L. Ed. 610, where the damage was due to negligence in unloading cargo:

"Nevertheless, in a practical sense, the ship was not under management at the time, but was the inert ground or floor of activities that looked not to her, but to getting the cargo ashore. And this consideration brings to light the limitation of the section, adopted by the court in The Glenochil, [1896] Prob. 10, and sanctioned by this court in Knott v. Botany Mills, 179 U. S. 69, 73, 74 [21 Sup. Ct. 30, 45 L. Ed. 90], to faults 'primarily connected with the navigation or the management of the vessel and not with the cargo.'"

Upon established principles of law, therefore, the libelants are entitled to decrees against the ship under their contracts for carriage. Beyond this point, the question of ultimate liability, raised by the shipowner's petition, can only be determined upon a finding of negligence. Upon all the evidence I am unable to find either of the respondents impleaded guilty of any fault contributing to this accident.

[6] The loading of this shaft was under the joint management and control of the shipowner and the stevedore. The stevedore deter-

mined the method of operation and carried it out; the hoisting was done by the ship's winch. When a thing which causes damage, without fault on the part of the complainant, is under the exclusive control of a person, and the occurrence is such as in the ordinary course of things does not happen if the person having such control uses proper care, it affords reasonable evidence in the absence of explanation that the damage arose from that person's want of care. "Res ipsa loquitur." This doctrine means, as stated in the recent case of Sweeney v. Erving, 228 U. S. 233, 33 Sup. Ct. 416, 57 L. Ed. 815, Ann. Cas. 1914D, 905:

> "That the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence, where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff."

[7] The maxim is based in part upon the consideration that, where the exclusive control of the thing that caused the damage is in a person, it is within his power, and not in the power of the complainant, to produce evidence of the actual cause. Here neither the stevedore nor the shipowner was in exclusive control of the loading; the control was joint. The record is barren of direct proof of the cause of this mishap. It would seem that an immediate inquiry must have disclosed the facts. No such investigation was made. However, even if the failure to explain the event as fully as the means then available would seem to permit should be deemed conclusive, the shipowner cannot shift its liability to the stevedore, for it is in pari delicto. The shipowner's pier superintendent was present and on duty, and all available means of ascertaining the facts were available to him.

So far as the evidence goes, neither the shipowner nor the stevedore was negligent in the premises. In the absence of direct proof as to what really caused the shaft to fall, various theories have been advanced as to what may have happened. It is suggested that the winch may have jerked, and that the shaft may have swung against the side of the hatch. But these excursions into the realm of speculation derive no support from the evidence. Evidence of negligence must be sufficiently clear, distinct, and preponderating to convince, without resort to conjecture. As Judge Thomas said in The Baron Innerdale (D. C.) 93 Fed. 493, courts are required to examine, compare, analyze, infer, weigh, and strike the balance of probabilities; but they are not required to hazard opinions that a person has been negligent, without the presentation of intelligible and substantial facts tending to establish the accusation. A question of fact may be refined to such a degree that an accurate solution is beyond any reliable intellectual process.

The stevedore seems to have taken every reasonable precaution. After his first experience with a shaft breaking loose he adopted, after careful examination, a method of loading in which practically no reli-

ance was placed upon the box inclosing the shaft. Apparently it differed in no substantial particular from the method usually employed by stevedores in hoisting a bare shaft. Certainly it was calculated, so far as I can see, to conform to every reasonable requirement of the situation.

Finally, the shipowner and the stevedore combine in urging that the ultimate responsibility should be fixed upon the shipper. They assert that the shaft was not securely packed, and that, no affirmative negligence on their part intervening, this was the real cause of the fall of the shaft and resulting damage. While the evidence shows that the shaft could have been more securely boxed, the method actually used was known both to the shipowner and the stevedore, and measures which were deemed sufficient were taken to deal with the situation actually presented. If the method of handling the shaft, which was finally adopted in view of the known circumstances, proved insufficient, it is futile to suggest that the resulting damage should be attributed to anything so remote as the method of packing adopted by the shipper.

I may add, however, that proof concerning more secure methods of packing related to packages which were usually handled intact, as the first three packages were handled. Where a shaft of this weight is hoisted simply by a chain around the box, the efficacy, or, if you please, the necessity, of inside cleats and heavy end supports is apparent. But after the first shaft came out of its case, the stevedore placed no further reliance upon the box as a support for the shaft. He slung it as he would have slung a bare shaft, carrying the weight on a heavy block preventer. With respect only to the play of two inches inside the box can it be contended with effect that the stevedore had not been apprised of the actual condition of the boxed shaft. Upon this fact an elaborate theory has been constructed. It is asserted that the grip of the chain upon the shaft as the package was dragged up the skid would pull the shaft against the top of the box, where it would be held until the shaft was hoisted over the hatch; then, when it was necessarily tilted toward a perpendicular position in order to get it through the hatch into the hold, the shaft would drop to the bottom of the box; and the theory is that this drop of two inches forced the preventer aside and let the shaft drop. The difficulty is that this theory is not supported by the evidence. There is nothing to indicate that the grip of the chain was sufficiently tight at any time to hold the weight of the shaft. When the package was dragged up the incline to the ship's side, the shaft would naturally slide down in the case. If, however, there is any ground for questioning this inference, there can be no doubt that when the package, slung as this was for the purpose of throwing the weight upon the preventer at the lower end, was suspended over the hatch, the shaft would inevitably slide to the bottom of the box. It was subsequent to this period, in the sequence of events, that this shaft fell out of its sling.

The libelants may have decrees against the ship. The petitions are dismissed.