QUINLIVAN v. NORTHWESTERN FIRE & MARINE INS. CO. SAME v. AUTOMOBILE INS. CO. OF HARTFORD, CONN. SAME v. GLOBE & RUTGERS FIRE INS. CO.

District Court, W. D. New York. February 15, 1929.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (William H. McGrann and Roger B. Siddall, both of New York City, of counsel), for libelant.

Bigham, Englar & Jones, of New York City (George S. Brengle, Martin P. Detels, and Pieter J. Kooiman, all of New York City, of counsel), for respondents.

HAZEL, District Judge. In these three consolidated cases, tried as one, libelant, owner of dredge No. 7, seeks to recover, under three marine insurance policies, damages arising out of the sinking of the dredge in Westchester creek on January 4, 1926. A description of the dredge, in so far as material, follows: She was 12-inch hydraulic steam-driven, 80 feet in length, and 24 feet wide, without motive power, though equipped with boiler and engine for operating a suction pump aboard her. She was fitted forward with a ladder rigging for lifting material from the bottom of the creek, and a long tubing for suction, moved by a derrick,

while in the top of the tubing there were means for pipe connection; the pipe being 24 feet 9 inches long and extending to the suction pump. The pipe was underneath the surface of the water, while the suction pump was located vertically athwartships on the dredge. The pipe discharged into a 12-inch cast-iron elbow pipe, which was about 7 feet long and curved at 90 degrees from the suction pump to the fore and aft discharge line, the line extending in a direct line about 38 feet from the elbow, the after end being just beneath the water, while the elbow was 3½ feet thereunder and attached to the pump. In operating the dredge, a floating or pontoon pipe was fixed to the discharge pipe at the stern of the dredge, leading to the shore.

While engaged in dredging, a large stone entered the so-called cutter, moved into the suction pipe, and thence to the pump, where it was discharged into the elbow and forcibly wedged, causing a fracture, which resulted in water entering the hull. Before the pump could be stopped, the water from the pump and the discharge line sank the dredge. The fracture of the elbow was the proximate cause of the disaster. The seaworthiness of the dredge at such time is in all respects conceded. The dispute arises over liability, under the terms of the policies, for expense in again floating the dredge and repairing her; it being contended by respondents that the exception clause barred recovery, inasmuch as no ejusdem generis, or accident in loading, or Inchmaree clauses were included.

Libelant's position is that the sinking resulted from perils of the sea or river or other waters specified in the policies. The material provision reads as follows:

"It is the intent of this Insurance Company by this policy, to *fully indemnify* the Assured for this Company's proportion of all General Average charges, Salvage expenses and loss, damage, detriment or hurt to said vessel for which they may be liable under this Policy, against the adventures and perils of the Harbors, Bays, Sounds, Seas, Rivers, and other waters as above named, and Fires that shall come to the hurt, detriment or damage of said vessel or any part thereof. Excepting always, all claims arising from or caused by the following, or other legally excepted causes, viz., * * * from the bursting or explosion of boilers, collapsing of flues or any injury, derangement or breakage of machinery unless caused by stress of weather, stranding collision or burning."

At the outstart the question is whether the damages eventuated from perils of the sea. English cases are cited wherein it is definitely ruled that when an occurrence to a ship results from circumstances of an accidental or misfortunate character, and sea water enters the vessel through her seams or through a hole in her hull, resulting in her injury, it constitutes a "peril of the sea" within the meaning of the insurance policy, in the absence of limiting language. See Hamilton v. Pandorf, 12 A. C. 518; The Xantho, 12 A. C. 503; Cohen v. National Benefit Association, 18 Ll. List. L. R. 119 (K. B. 1924); and Blackburn v. Liverpool Insurance Co., 1 K. B. 290.

In Hamilton v. Pandorf, supra, a case where rats gnawed a hole in a pipe and sea water entered the ship damaging the cargo, the House of Lords substantially ruled that the term "peril of the sea" is not necessarily limited to a storm or other misadventure, since other unintentional contingencies might let water into the vessel, resulting in her sinking, and that such an occurrence would fall within the contemplated understanding of the insurer and assured, and, unless the marine policy contained words of limitation, recovery under the clause of perils of the sea was warranted.

In McAllister & Co. v. Western Assurance Co., of City of Toronto, 218 App. Div. 564, 218 N. Y. S. 658, this principle apparently was followed in a case where the insurance policy was of the same general form as here. In that case the seams of a coal barge were strained and opened owing to the placement of three derricks or unloading buckets in three different hatches, one derrick in the stern hatch, another in the third hatch, and another in the bow hatch. The evidence showed that taking the coal out of the two end hatches to the bottom of the vessel, leaving the coal in the middle hatch untouched, was the primary cause of straining her seams and letting in the water. The court held that the term "peril of the sea" in the policy included the resulting damage.

In opposition to the line of English adjudications and the McAllister Case, holding that injury of a ship through leakage or a break in a pipe or the hull was per se a peril of the sea, respondents urge that in the federal courts, and especially by the Supreme Court in The G. R. Booth, 171 U. S. 450, 19 S. Ct. 9, 43 L. Ed. 234, a different rule has been enunciated. The Booth Case was a libel by a shipper against a steamship, water having entered the vessel through a large opening torn in her side, while at her wharf, in consequence of the accidental explosion of several cases of detonators, stowed aboard, together with other merchandise in the after-hold. Sea water, entering the hold, damaged

libelant's cargo of sugar. It was an accidental explosion without fault attributable to the ship or in the discharge of her cargo. The bill of lading under which the sugar was transported contained a clause that the ship should not be liable for loss ensuing from perils of the sea by explosion, bursting of boilers, or "other accidents of navigation, of whatsoever kind." The learned court declared that the words "perils of the sea" have the same meaning in a bill of lading as in an insurance policy, with certain specified exceptions; and, inasmuch as the explosion was the predominant and proximate cause of the damage, the instant inflow of water was incidental thereto, "and not a new and independent cause," and was a necessary, instantaneous result and effect of the bursting open of the ship's side by the explosion; and that there were two concurrent causes of the damage, viz., the explosion of the detonators and the inflow of water without "any possibility of distinguishing the amount of damage done by each," and hence the court said the explosion "as the cause which set the water in motion, and gave it its efficiency for harm at the time of the disaster, must be regarded as the predominant cause." It is clear that the basis of the decision was the fact that the explosion and inflow of water were inseparably linked together, and the entry of the water was "one of a continuous chain of events" resulting from the explosion, and, since the damage was not attributable to any violent action of wind or waves or collision, and arose out of the nature of the cargo, it could not be considered as a peril of the sea. The decision is apparently contrary to the ruling in the McAllister Case above mentioned, and presumably was not called to the attention of the Appellate Division. However, in the G. R. Booth Case the navigation of the ship was not a factor of the accident, the cause having been due to an act within the ship, and I think a different situation is presented than in the instant case, where a rock was dredged up from the water in the ordinary dredging operation—a maritime employment—and is the real and proximate cause of the breaking of the elbow joint, followed by the entry of the water. The inrush of the water was directly attributable to the rock coming from outside the dredge in the course of her operation. It was not separable from the particular use of the dredge. It has no analogy to a cause emanating aboard the dredge, or to a cause originating from loading or unloading apparatus breaking through the bottom, as in The Zulia (D. C.) 255 F. 433. The stone entering the pipe extension from the creek, and thence passing to the elbow, comes closer in comparison to a ship striking a rock and puncturing her bottom, which, I take it, would be a loss due to a peril of the sea. The statement of the Supreme Court in the Booth Case that the words "perils of the sea" have like import, when used in a bill of lading or in a marine insurance policy, does not mean that exceptions in bills of lading are not to be strictly construed. Insurance policies have invariably received a more liberal construction. The distinction is pointedly suggested in Arbib, etc., v. Second Russian Insurance Co., 294 F. 811, wherein the Circuit Court of Appeals for this circuit said that: "A distinction exists between the legal effect on a common carrier and the legal effect on an insurer in the case of a loss arising from a peril of the sea."

■■ Respondents further contend that the exceptions in the policy excluding "claims arising from or caused by * * * any injury, derangement or breakage of machinery," unless caused by stress of weather, bars recovery. The question, therefore, squarely arises as to whether the elbow pipe rightly comes within the general term of machinery. It was used as a conduit for the débris of the creek's bottom which had been sucked up. The water, silt, and stone were not deposited on the dredge, but pumped to the discharge point outside the dredge. I do not think that the elbow pipe can fairly be considered "machinery." Bursting or explosion of boilers and collapsing of flues are specifically excepted, and in the same sentence follows the general reference to any injury, derangement, or breakage of machinery. The context is open to the inference that the word "machinery" refers to the machine appliance, and not to an elbow pipe or appurtenance used to keep water out of the dredge. The adjudications, true enough, make a wide distinction between a machine and machinery, as, for example, in National Enameling Co. v. Zirkovics (C. C. A.) 251 F. 184, where the pipes, and apparatus and certain other appurtenances designed to effect a common end, were held to be a part of the machinery; and in Tubbs v. Insurance Co., 131 Iowa, 217, 108 N. W. 324, where a fire policy covered "'machinery of all kinds and descriptions, while contained' in said building," used in connection with a steam laundry; and in Washington Gaslight Co. v. District of Columbia, 161 U. S. 316, 16 S. Ct. 564, 40 L. Ed. 712, where street pipes attached to a pump constituted machinery. These adjudications however, do not apply in a case like this, where the interpretation must be accorded in the light

of the manifest intention of the assured and assurers. The English case of The Arsa, 23 Ll. List. L. R. 273 (affirmed 24 Ll. List. L. R. 219), comes close to the question here. There the cargo of a ship was damaged owing to a latent defect in a so-called nonreturn valve on a pipe discharge from the galley, and the court ruled that the valve (a movable part) was not classifiable as machinery within the terms of the exception clause. Proctor for respondents seems to agree that as the principal function of the valve in the Arsa Case was to keep water out of the ship, the case was rightly decided on the theory that it was a part of the hull; but in this case the elbow pipe also kept the water out of the hull in its normal operations. In N. K. Fairbank & Co. v. Cincinnati Ry. Co., 81 F. 289. Mr. Justice Taft of the Supreme Court, then sitting in the Circuit Court of Appeals for the Sixth Circuit, construed a provision in a bill of lading exempting the carrier from liability for "loss or damage arising from * * * collisions, explosions, accidents to boilers or machinery, * * *" and ruled that the term "machinery" in that case applied only to a group of mechanical parts connected with the boiler and steam supply, and that, under the bill of lading, the carrier was not exempted from liability for damage ensuing from the fracture of an axle of a car. In other words, the term "machinery" was restricted to mechanical instrumentalities and did not include the axle of a car which gave momentum to the wheels. The learned court said upon this point: "While doubtful cases may be suggested, we are very clear in our opinion that those devices and parts of a car which have no physical operation and connection with the locomotive except by means of the cars of the train and the couplers between them are not within the meaning of the term 'machinery' in the phrase 'accidents to boilers and machinery.' " Distinctions are manifestly recognized in interpretation of the term in question, both in contracts and policies and in statutory trials for negligence. In some instances a restricted meaning is applied, and in others a broader one to comport with the facts and circumstances and intention of the parties.

■ There was testimony by expert witnesses on behalf of respondents that the elbow pipe was properly classified as machinery, while on the part of libelant there was testimony that in the dredging trade the elbow in the pipe was known as a hull fitting or pipe, considered a part of the hull; and two witnesses testified further that it is generally regarded that a dredge is provided with three distinct machinery classifications: The pump machinery, the halting and hoisting machinery, and the agitating machinery. Libelant's rebuttal testimony, as to the elbow pipe designation, outweighs that of respondents, and, since the dredging business is more or less separated from ordinary shipping, the expert opinions were properly received as advisory.

■ My conclusion is that the term "perils of the sea," as used in the policy, contemplated liability for the damages in question, and that the exception clause must be construed against the insurers, and, so construed, respondents are not exonerated from liability.

Decree for libelants, with costs.