## THE WEST ARROW.

### Nos. 14019, 14056.

District Court, E. D. New York.
June 22, 1934.

828

Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones, of New York City, of counsel), for libelants.

Hunt, Hill & Betts, of New York City (John W. Crandall and Frank J. Zito, both of New York City, of counsel), for claimant.

CAMPBELL, District Judge.

The two above-entitled suits were consolidated for the purpose of trial only. ·

The libels in these suits were filed against the steamship West Arrow, in rem, and against her owner, American Diamond Lines, Inc., in personam (which I will hereinafter call the claimant-respondent).

The suits were instituted to recover for loss of and damage to cargo alleged to have been owned by the above-named libelants and shipped on board the steamship West Arrow, at the ports of Philadelphia and Baltimore, in November, 1933, for carriage to Antwerp and Rotterdam, which loss of and damage to cargo is alleged to have resulted from the stranding of the West Arrow, at Fort McHenry, Baltimore, on the evening of November 9, 1933.

The libels allege that the claimant-respondent was operating the steamship West Arrow as a common carrier for hire; that the cargo was shipped on board her by the libelants in good condition under an agreement to carry it to destination and there deliver it in like good order and condition as when shipped; that the merchandise was not delivered at destination in good order and condition, but was discharged at the port of Baltimore in a badly damaged condition, the damage consisting in part of breakage and contact with sea water; and that some of the cargo was entirely lost in the port of Baltimore. The damages prayed for are in the sum of $70,000.

The present libelants originally filed libels against the steamship West Arrow in the United States District Court for the District of Maryland, at Baltimore, and the ship was arrested.

Thereafter, for the convenience of counsel, those suits were discontinued under an agreement whereby the owner of the steamship West Arrow agreed to appear in this district and furnish adequate security.

The above-entitled suits were then commenced in this district.

In addition to the claims incorporated in the present suits, there are some additional claims for damage to cargo, that of E. J. O'Brien & Co., on shipments of tobacco, on which no suit has been brought, and that on shipments of linseed oil cake, on which the Bisbee Linseed Company has filed a libel.

The total approximate sum involved in this litigation is $80,000.

The claimant-respondent in its answers to the libels and interrogatories annexed to the libels in the above-entitled suits admits that the merchandise when received on board the steamship West Arrow was in apparent good order and condition; that, when the vessel put back at her pier in Baltimore, a considerable part of the merchandise referred to in the libels was found to be wet, through contact with water, as the result of the stranding of the vessel off Fort McHenry, Baltimore, on November 9, 1933.

The claimant-respondent alleges, as a separate defense, the circumstances of the stranding substantially as proven on the trial, and then pleads the third section of the

Harter Act, which section in substance provides that a vessel owner shall be relieved of responsibility for loss or damage resulting from faults or errors in navigation, or in the management of the vessel, or from dangers of the sea, provided the owner shall have exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied; and further alleges that the damage to libelant's merchandise was due to causes within the exceptions contained in the third section of the Harter Act (46 USCA § 192); that, having exercised due diligence to provide a seaworthy vessel, it is exempted from liability under the provisions of that Act.

The claimant-respondent alleges, as a further separate defense, that the bills of lading contain certain exceptions against liability, including (1) perils of the sea; (2) latent defects in hull, machinery, or appurtenances, or unseaworthiness of the vessel, whether existing at the time of shipment, provided the respondent shall have exercised due diligence to furnish a seaworthy ship; (3) rust, breakage, leakage, and water; and further alleges that the loss or damage was not caused by its negligence, and that the loss or damage fell within the bill of lading exceptions above mentioned, and accordingly it is relieved from responsibility therefor.

The facts are as follows:

The West Arrow is a steamer 423 feet long and 55 feet beam. Her tonnage is 5,589 gross, and 3,513 net tons. She is equipped with General Electric turbine engines and has a right-handed screw.

The West Arrow was equipped with a telemotor system made by the American Engineering Company of Philadelphia, one of the two largest American manufacturers of telemotors, which consists of two units, one in the pilot house and one aft alongside the steering engine. The forward unit has two parallel cylinders, each containing a plunger. The plungers are put in motion through a series of pinions and gears, by turning the steering wheel. When one plunger enters its cylinder, the other plunger is withdrawn. The after unit is practically the same as the forward one, except that the cylinders are in tandem.

The movement of the plungers in the cylinders of the after unit is transmitted to the control valve of the steering gear, through a crosshead and a series of links. There are two springs in the after plungers, which are in tension for a movement in one direction. These springs are used to assist in the return of the after unit to its central position. The forward and after units are connected with two lines of copper tubing.

There is an automatic by-pass valve on the forward unit, the function of which is to place the two sides of the telemotor system in communication with each other when the entire system is on center; that is, when the wheel is amidships. The valve also places the system in communication with the supply tank in the pilot house and allows fluid from this tank to flow to either or both sides of the system to compensate for any leakage that might occur on either side. When the steering wheel is turned to port or starboard, the two sides of the system are independent of each other and pressure-tight.

The telemotor lines are filled with a fluid which in this instance was Telco Oil A. A., manufactured by Vacuum Oil Company. When all air has been removed from the system, there is a solid hydraulic link between the forward and after control stations. When the steering wheel is revolved, one plunger in the forward unit is depressed and the other is withdrawn. By depressing the plunger, the pressure is built up in the line, and this pressure acts on the corresponding plunger in the after unit, which causes it to be withdrawn from its cylinder. The movement of the after unit is transmitted to the steam steering gear in the manner previously described.

On November 9, 1933, the West Arrow had been lying bow out on the north side of pier 6, Locust Point, Baltimore, Md., and she left her pier at 6:13 o'clock p. m., laden with 3,600 tons of cargo, under command of her master, unassisted by any tugs, bound for Antwerp and Rotterdam via Norfolk, Va.

Prior to undocking, her steering gear and her telemotor were tested and found to be working satisfactorily. Capt. Benton, the ship's master, did not believe that the ship had used both her starboard and port helm in undocking, but her chief engineer, Dennis J. Griffin, and her third officer, Samuel L. Cobb, testified positively that the helm was operated both ways during the undocking.

At 6:23½ p. m. the ship's maneuvers, incident to undocking, were completed, and she was headed down Northwest Harbor, Baltimore, off Pier 5, Locust Point, at which time the direction of her navigation was turned over to a Chesapeake Bay pilot, Charles S. Drennan, Jr. Her drafts on leaving her pier were 18 feet 2 inches forward, and 18 feet 6 inches aft. The tide was

high-water slack, the weather was clear, the night was dark, and there was a light northwest wind.

On the West Arrow's bridge were Benton, the master, Drennan, the Chesapeake Bay pilot, Cobb, the third officer, and Jasper A. Celestino, a cadet officer who was at the wheel. The chief officer, Melvin V. Mundy, with the boatswain and four sailors, were on the forecastle head, and the second officer, Shelton, and four sailors, were on the poop deck.

When the pilot took command, Lazaretto Point bore 1½ points on the ship's starboard bow, and her full speed in the harbor, under the particular conditions, was about ten knots. When her navigation was turned over to the pilot, however, the ship's engines were half ahead, and she was making between four and six knots. The pilot ordered the helmsman to port the helm (old commands), to put the light on Lazaretto Point directly ahead. The helmsman executed this order, and, when the light came ahead, the pilot ordered the helmsman to steady the helm, but it was noted that the ship did not steady, but that, on the contrary, her bow continued to swing to starboard. At that time she was running on a course of 160 degrees true, was about a ship's length off the pier line, and about 1,500 feet from the point of stranding. The pilot, on observing that the vessel's bow continued to turn to starboard in spite of the "steady" order, ordered the engines full speed ahead at 6:28 p. m. and the helm hard astarboard. The engines were kept full ahead for about half a minute, and then the pilot ordered them stopped, and they were kept stopped for about half a minute, and the chief officer was directed to have both anchors ready to let go. At 6:29 p. m., the captain rang the engines full astern, and both anchors were dropped. The West Arrow then forged ahead about half a ship's length, and stranded approximately half a ship's length from the fireboat pier at Fort McHenry, and she was headed directly for that pier, at about 169 degrees true, when she stranded.

Directly after the stranding, the West Arrow's starboard anchor was hove up, she was backed up sufficiently to clear the shoal, and she was later backed up clear of the channel and came to anchor for the night, and then an investigation was made to ascertain whether there was anything the matter with her telemotor or steam steering gear. The telemotor was disconnected, and the chief engineer tested the steering engine with the trick wheel and found that it operated properly. The telemotor was then connected up to the steering engine, and a test was made by turning the steering wheel in the pilot house, and it was found that the rudder, although it followed the wheel to starboard and back to amidships, did not follow the wheel to port. The oil in the telemotor lines was then drained out and other oil was pumped in, and the telemotor then functioned properly. The West Arrow proceeded back to her pier without any assistance the next morning, November 10th.

When the vessel stranded, a hole several feet long was stove in her bottom, under the No. 1 hold, and a large quantity of water entered that hold and did the damage complained of. Whether the hole was caused by the ship's running up on her starboard anchor, or was due to her striking a hard ledge, is not clearly shown. There was a hard ledge in that locality.

Benton, the master, Cobb, the third officer, Griffin, the chief engineer, and Smith, the third assistant engineer, were of the opinion that the hole was caused by the anchor.

The West Arrow went to the repair yard of the Bethlehem Shipbuilding Corporation at Baltimore, Md., on November 15, 1933, where repairs were made on account of the bottom damage sustained in the stranding. While she was in the repair yard, her telemotor system was subjected to a detailed examination and tests were made to ascertain whether there was anything wrong with it.

The state of incorporation, organization, composition, residence, and capacity to sue of all the libelants was stipulated.

The receipt by the claimant-respondent of various notices of claim was also stipulated, but the issue of libelant's compliance with the requirements of notice clause, or the necessity therefor, has been reserved until after the trial upon the merits.

The following facts are either admitted in the claimant-respondent's answer or covered by stipulations of the parties: The libelant and claimant-respondent have the legal status as alleged in the pleadings; at the time of the damage, the libelants had sufficient interest in the shipments to maintain these actions; the steamship West Arrow was a general ship engaged in the common carriage of merchandise for hire; the libelants shipped on board the steamship West Arrow at the respective ports of shipment, in apparent good order and condition, the merchandise described in the libels, and a

---

considerable part of the merchandise was discharged at the port of Baltimore, damaged by contact with water, and was not in the same condition as when delivered to the claimant-respondent and placed on board the steamship West Arrow.

On all the evidence in this case I am unable to agree with the contention of the claimant-respondent, that the cause of the stranding of the West Arrow was latent defects in hull, machinery, or appliances, etc.; on the contrary, the testimony of Capt. Benton, master of the West Arrow, Capt. Pilcher, and Capt. Ganaird, called by claimant-respondent as experts, convinces me that the proximate cause of the stranding was negligence in navigation. The vessel and claimant-respondent are liable for all damages flowing from negligence in navigation, unless the claimant-respondent can show that it is entitled to exoneration under the Harter Act (46 USCA § 190 et seq.). Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 438, 9 S. Ct. 469, 32 L. Ed. 788.

The burden of proof is on the claimant-respondent to establish that it has exercised due diligence to make the ship in all respects seaworthy.. W. J. McCahan Sugar Refining Co. v. The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 226, 21 S. Ct. 591, 45 L. Ed. 830; The Jason, 225 U. S. 32, 51, 32 S. Ct. 560, 56 L. Ed. 969; Earle & Stoddart v. Ellerman's Wilson Line, 287 U. S. 420, 427, 53 S. Ct. 200, 77 L. Ed. 403.

The fact that the damage was alleged to be caused by sea water, an excepted cause, does not relieve the claimant-respondent of the burden of proof, as the evidence clearly shows that there were tons of sea water in the No. 1 hold of the West Arrow, where the cargo in question was stowed. Herman v. Compagnie Generale Transatlantique (C. C. A.) 242 F. 859.

On the evidence, there could be no finding that the proximate cause of damage was sea water. The G. R. Booth, 171 U. S. 450, 19 S. Ct. 9, 43 L. Ed. 234.

This brings us to a consideration of the question, Did the claimant-respondent exercise due diligence to make the West Arrow seaworthy at the commencement of the voyage?

The West Arrow was built in 1918, has the highest classification in the American Bureau of Shipping, and carries the symbol of the Maltese Cross in the American Bureau

Register, signifying that she was built under the special survey and supervision of the American Bureau of Shipping.

Special survey No. 3 of the ship was commenced on February 20, 1930, and completed on October 6, 1931. This was a most rigid survey.

The West Arrow was in dry dock on May 8, 1933, and, on the completion of the work on the West Arrow, the surveyor stated that the vessel was in a good and seaworthy condition, and recommended that she be retained in her present class in the Bureau.

On September 14, 1933, the annual boiler survey on the West Arrow was completed, and the surveyor recommended that the vessel be retained in her present class with the Bureau.

Before the vessel left Pier 6 on November 9, 1933, her hatches, booms, and gears were secured, her whistle had been tested, and her running lights were lit. She was adequately supplied with stores, etc., and was properly equipped. She carried a crew of thirty-one including the master, all of whom were competent, experienced men.

The West Arrow was an oil burner and had on hand 7,775 barrels of oil, which was sufficient to carry her to Rotterdam and back to the United States.

The general seaworthiness of the West Arrow was established.

This brings us to the question of the seaworthiness of the telemotor system.

The telemotor of the West Arrow was made by the American Engineering Company of Philadelphia, Pa. It was a standard make of telemotor. About 2,000 telemotors of this type have been built by the manufacturers, and about 1,500 of such telemotors are now either actually in use on ships or available for service.

The West Arrow was not bound to have the latest and most improved telemotor.

The West Arrow used in her telemotor system Telco Oil A. A., prepared by the Vacuum Oil Company, which was a low viscosity oil with a pour point of 35 degrees minus Fahrenheit; that is, an oil which will not congeal at a temperature higher than 35 degrees below zero. This oil was prepared by being distilled from crude oil and then treated with sulphuric acid, after which it filtered through fuller's earth, a natural clay, and, before being placed in cans for delivery, it is strained through a 60-mesh brass screen.

The instructions issued by the manufacturer of the telemotor used by the West Ar-

row directed that, in putting oil in the system, it should be strained through several layers of cheesecloth, but it does not seem to me that this was an exclusive method. The purpose was that there should be certainty about the oil being free from dirt, and, as I view it, that might be determined in many ways. The reason that cheesecloth was mentioned instead of wire mesh strainer was that cheesecloth could be secured anywhere, while wire mesh strainers might not be obtainable at many ports, and several layers of cheesecloth were mentioned because the mesh of cheesecloth varies so greatly in various places that protection would not be secured by the use of one layer.

Straining through cheesecloth of oil manufactured by such a process as that hereinbefore described was unnecessary, as it would be perfectly safe to pour such oil into a telemotor system, if it was introduced by straining it through an unbroken fine mesh wire cloth strainer of the mesh in use on the steamship West Arrow.

In the early days of these telemotors, glycerine and oil were used and straining was necessary, and, although the instructions issued by the manufacturer as late as October, 1926, directed such straining through several layers of cheesecloth, that seems to me to have been through excess of caution, but principally to impress upon the user the necessity of using clean oil.

The engineers of the West Arrow always took care to see that the receptacles used in pouring the oil into the system were perfectly clean.

The first assistant engineer replenished the telemotor oil in the gravity tank in the pilot house when the ship was at Boston, on or about October 27, 1933, and the tank was then filled about three-quarters full.

Both the master and third assistant engineer went to the pilot house before the ship left the pier on November 9, 1933, and by looking at the gauge glass determined that the tank was then filled from two-thirds to three-quarters full.

Either of these amounts were much in excess of what was sufficient for replenishing the system.

There was constant communication between the by-pass valve and the gravity tank, as the plug-cock on the supply line leading to the gravity tank was always kept open.

The first assistant engineer was charged primarily with the duty of looking after the telemotor system, and at Boston in October, 1933, he examined the lines carefully, wherever he could get at them, and saw no oil moisture around any of the joints in the pipes, but, if at any time in the course of an examination he did see any moisture at the joints, he would immediately tighten them up. Of course, he could not look at the lines through the shelter deck, which were incased in lagging.

By automatically admitting fluid from the filling tank into the system each time the wheel is on center, the by-pass valve will compensate for any leakage which does not exceed the capacity of the forward filling tank.

After the stranding, and before going to the shipyard, the telemotor system in and of itself was not changed in any way, nor were any adjustments or work of any kind made or done in any part of the system, but, after the stranding, when it was found that the rudder, although it followed the wheel to starboard, did not follow the wheel to port, the oil of the telemotor lines was drained out and other oil pumped in, and with that oil the telemotor functioned properly.

When the West Arrow went into the repair yard, the system was in the same condition as it was at the time of the stranding, except that the oil in the system was that which was introduced after the stranding and not that which was in the system at the time of the stranding, and the telemotor was functioning properly.

When the West Arrow went into the repair yard, her whole telemotor system was at once cleared for examination; the lagging covering the telemotor pipes in the shelter deck being taken down. The system was subjected to a pressure of from 500 to 600 pounds by blocking the telemotor plungers, and a minute examination made to ascertain whether there were any leaks of any kind in the lines. There was found one tear drop in the engineroom bulkhead, two tear drops in the port lines at unions in the shaft alley, and there was a small particle of oil sweat in the starboard line in the engine room. In the places ordinarily covered by the lagging, which had been removed, the lines were perfectly sound.

The tear drops and sweat hereinbefore described did not come within the category of leaks, and even those did not appear until the system had been under pressure of approximately 600 pounds for some ten minutes, whereas the normal working pressure on this system was about 80 pounds. The

tear drops and sweat hereinbefore described would not have appeared under normal pressure, and, if they had, such a condition would have been compensated for by the by-pass valve.

The by-pass valve was not taken apart, examined, and reassembled while the vessel was in Baltimore prior to her departure on November 9, 1933, and there was no reason why this valve should be taken apart and examined every time the vessel left port.

The valve had been taken apart by the first assistant engineer at Rotterdam, in October, who examined the valve disks and adjusted the springs, and cleaned the valve thoroughly. He put in new leather washers and went over the valve stem, but did not put in new disks.

The by-pass valve was taken apart when the ship was in the repair yard, after the stranding, and carefully examined, but there was not found anything the matter with it; however, as a matter of form, the valves were ground in a little bit, put back, and cleaned out. The valves inside the by-pass valve required no grinding.

The first assistant engineer carefully examined the valve disks when he had the by-pass valve apart in Rotterdam, and found the joints between the disks and their seats were proper and in good condition.

No repairs were made to the telemotor by the Bethlehem Shipbuilding Corporation. Brierley, the libelant's expert, was aboard the ship and an opportunity was given him to examine the by-pass valve with great care.

Harrison, who is an expert on telemotors, visited the West Arrow on November 23, 1933, and had the first assistant engineer take the by-pass valve apart for his inspection.

He testified that the parts of the valve were all perfect, and that each valve seat within the by-pass valve gave evidence of being fluid-tight and perfect in every respect.

I am not unmindful of the fact that, as contended on behalf of libelant, the valve disks were not in exactly the same condition on November 23, 1933, as at the time of stranding, but, if Cirul's testimony, which was not contradicted, is accepted as true, the valves did not need grinding, but that he ground them in a little bit as a matter of form. To this grinding, as described by Cirul, Harrison attached no significance, as he said that was something that any engineer would do with a mechanism requiring

as much labor to take apart as a by-pass valve requires.

At the time of the West Arrow's No. 3 survey, the by-pass valve, telemotor, and steering gear were found to be in good condition by Yates, the engineering surveyor, who surveyed the telemotor and the steering gear on that survey.

The telemotor system on the West Arrow is equipped with two tanks, one in the pilot house known as the gravity or make-up tank, and the other in the steering engine room. Each tank was equipped with a strainer of approximately the same size; that is, with the mesh of the strainers 40x28.

The first assistant engineer testified that he examined the forward strainer on October 27, 1933, and that it was in first-class condition. The third assistant engineer was with the first assistant engineer when oil was put into the gravity tank in Boston, and said that he saw the strainer and that it was in perfect condition at that time.

The chief engineer says that he saw the strainers on both tanks when the ship was in Boston, about the end of October, 1933, and that they were in good condition. The strainers were not examined by the engineer on November 9th before the ship sailed; and, while I do not believe such an examination should form part of the ordinary test before undocking, the engineer in charge of the telemotor should have examined the strainers before the ship started on her European voyage.

The chief engineer says he examined the strainer after the stranding and found it in good condition, and the first assistant engineer says he saw the strainer six days after, on November 15th, and that it was in the same good condition in which he saw it in Boston.

This is seriously contested on the part of the libelants, who offered the testimony of Brierley, a marine surveyor and holder of a chief engineer's license, Grimes, a lawyer of Baltimore, and Prem, a lawyer associated with the proctors for libelants.

They all agree that on November 21, 1933, they boarded the West Arrow with the permission of the port superintendent of the owner of the West Arrow and her master, and with the knowledge of the chief engineer of that vessel, and, accompanied by him, made an examination of the machinery in the steering room aft and then proceeded to the pilot house, where the operation of the

telemotor system from that point was explained by the chief engineer.

Grimes saw the instructions for operating the telemotor, in evidence, in a glass frame on the wall of the pilot house.

After explanation by the chief engineer, the group left the pilot house, but later Brierley, Grimes, and Prem returned for further examination, and stood upon a chair and looked into the filling tank and saw that the strainer was displaced and broken, there being one hole three-fourths of an inch long and one-half to one inch wide, and there were several other smaller holes, that the strainer was dirty, and that there was refuse on the strainer other than oil.

The chief engineer was invited to return to the pilot house, and Prem, there in the presence of Brierley, Grimes, and Jolly, the port superintendent of the owner of the West Arrow, directed the chief engineer's attention to the condition of the strainer. Prem also stated to Jolly that there was a hole in the strainer, to which he made no reply.

The chief engineer is evidently in error when he says that on that day, November 21, 1933, he caused the holes in the screen with a screwdriver, in removing the screen.

The chief engineer is certainly in error when he says that he gave the strainer, which he removed, to Prem.

The claimant-respondent contends that what the aforesaid group found on the West Arrow, on November 21, 1933, is immaterial, and is not proof of the condition of the strainer on November 9, 1933, the date of the stranding, but that contention is not sustained, as the witnesses called on behalf of the West Arrow said that the strainer was in the same condition on November 21, 1933, as on November 9, 1933.

There is a sharp conflict in the evidence as to the existence of such holes in the strainer, but I accept the testimony of Brierley, Grimes, and Prem as true, and find that such holes were in the strainer at the time of the stranding, November 9, 1933.

Peterson, a former chief engineer of the West Arrow, in the early part of 1929, installed a vent pipe forward of the by-pass valve, which extended over to the top of the gravity tank, and was installed for the purpose of taking care of any air that there might be in the system. Prior to such installation, air in the lines was allowed to escape by means of a pet cock manipulated by hand, which was located on the by-pass valve. It seems to me to be of no moment in this case whether the vent pipe had merit or otherwise; the fact is that a cover was provided by the manufacturers to go over the strainer on the gravity tank, and that, as a result of the installation of such vent pipe, the cover could not be put over the strainer, as contemplated by the manufacturer.

I have not overlooked the argument on behalf of claimant-respondent that there was no danger to be apprehended from dirt that might enter the telemotor system, and that dirt would not enter by reason of leaving the strainer uncovered, but I am not in agreement with such argument.

The previous history of the operation of the telemotor of the West Arrow was excellent. There had never been any previous trouble with the telemotor. Once some years before the time in question, the ship had taken a sheer on leaving Philadelphia, and it was for a moment thought that something might be wrong with her telemotor, but it was found to be in perfect order.

The test made before the West Arrow left the pier was the usual and ordinary seagoing test.

Mechanically the telemotor, as a whole, was in good condition, and there appears to have been nothing wrong with the packing; in fact, all the witnesses from the Bethlehem Shipbuilding Corporation, and the engineers of the West Arrow, agree that the packing in the system was in first-class condition.

I attach no significance to the fact that packing was taken out while the ship was in the repair yard and a new-style packing put in while the unit was disassembled, for the reason that, by the use of the new-style packing, they could in the future, if occasion required, remove the packing with packing screws, instead of being compelled to disassemble the plungers in order to take this packing out.

The control valve in and of itself, and its condition mechanically, was not the cause of the failure of the telemotor to function properly, when the order was given to port the helm.

The fact that, after the system was filled with oil at the yard of the Bethlehem Shipbuilding Corporation, the steam engine would not center with the telemotor, does not seem to me to be of importance, as the new-style packing had been installed in the after plungers while the system was disassembled, and this had caused the necessity for the readjustment of an eighth of an inch. As I

understand it, when both units were as they had been before entering the yard, the pin would go in, but, when one unit had been centered and the other had not been centered, the pin would not go in. This is confirmed by the evidence·that later, after the packing had loosened up under operation and had been well lubricated, it was found necessary to put the valve back in its original location.

This was undoubtedly the situation with the valve before the stranding.

In any event, even if the control valve was one-eighth of an inch off center, on all the evidence it would not account for the failure of the telemotor to function under the order to port the helm, as its effect would be hardly noticeable. What would happen would be that the valve would uncover the steam port a moment earlier, and the engine would start a little more quickly than it would if it was in absolutely central position.

We have considered all possible causes which could have produced the temporary derangement of the telemotor which occurred, except the binding or cocking of a valve in the by-pass valve, which the claimant-respondent contends constituted a latent defect in the by-pass valve, for which the ship and claimant-respondent were not liable under the terms of the bill of lading.

There is no positive evidence of the binding or cocking of the valve. The most that is offered is the claimant-respondent's contention that the only possible conclusion is that there was a sticking or binding of the valve-actuating plunger, which conclusion appears to be based on the fact that such a fault in that particular type of valve had been called to the attention of the Sperry Gyroscope Company and Harrison, representing the manufacturers of such valves, it having been reported to Harrison in about a dozen cases where the lifting rod had failed to return to its normal position, and caused the valve to stay open. It was decided that this fault was due to the fact that a spring was used to secure the return of the lift rod to its normal position, and the Sperry Gyroscope Company designed the new type valve which is mechanically operated, making it independent of spring action for return to normal, and making it independent of friction or cocking.

This design was patented and the patent sold to American Engineering Company.

The spring was not broken in the West Arrow's valve, and, according to claimant-respondent's witnesses, if this binding or cocking action had occurred, it would be impossible to determine, by looking at it externally, and further, even if the valve had previously stuck, there would have been no indication of it on the valve itself, which could have been observed very easily, unless an engineer used a pair of calipers or a micrometer.

There is no evidence of any engineer making a test of this character, so we end as we began as to this possibility of the telemotor having failed to function because of a binding or cocking action in the port inside valve of the by-pass valve, that it is merely a possible conclusion unsupported by convincing evidence.

The two faults that stand out in these cases are that, in spite of the absolute necessity, to which all agree, of keeping the oil· free from dirt or grit, which was so emphatically urged in the instructions furnished by the manufacturer, the claimant-respondent allowed the ship to leave her wharf, and the ship did leave her wharf, not only with the gravity tank in the pilot house uncovered with the cover provided by the manufacturer, but by the allowance of the erection of the vent pipe had made it impossible to fully cover the strainer, and also with a strainer in said tank with holes in it sufficient in size to allow the admission of dirt or grit, which could interfere with the proper operation of the telemotor.

Of course, it was not a part of the required operation test, before leaving the dock on each occasion, to examine this tank, but there was an assistant engineer charged with the duty of attending to the telemotor and keeping it supplied with oil, and certainly it was his duty and the duty of the shipowner to ascertain the condition of such tank before leaving the wharf on a voyage of the character of that on which the West Arrow was leaving.

On behalf of claimant-respondent, evidence was offered to show how, after the stranding, the oil was drained out into buckets and then poured through funnels into five-gallon cans, that the oil was not strained, and that nothing was done to the oil except to put it into those cans, that the cans were covered, and that the cans were delivered to the Pittsburgh Testing Laboratory, where they were tested, and the only residue found was soft in character and resembled small particles of burned or charred leaf; but I am not convinced that grit or dirt

might not have adhered to the sides of the buckets when the cans were filled.

After the West Arrow went into the repair yard, the oil which had been pumped into the system after the stranding ran freely out of the pipes, and was examined visually, and no grit or foreign matter was observed in it.

After that oil was drained out, a connection was made to the by-pass valve and also to a valve in the telemotor pump in the steering engine room, and 90 pounds pressure of compressed air was applied to each telemotor line, and each line was blown out in turn with compressed air. Schoner, of the Bethlehem Company, testified that he stood at the ends of the lines in the shaft alley, with his hand held three or four inches from the end of each pipe, as the compressed air was passing through the pipe, and no grit or foreign matter of any kind came out of the lines onto his hand.

In spite of all this, however, we have the fact that the telemotor would not function properly; that the ship stranded; that thereafter the telemotor would not function properly; that nothing was done to the telemotor but to drain off the oil then in it and to pump in the other oil; and that immediately after the other oil was pumped in the telemotor functioned properly.

If there is any other proof in this case as persuasive as this with reference to any other possible cause, I have failed to observe it. I am not unmindful of the fact that one of the claimant-respondent's witnesses thought this was not evidence that the cause was in the oil, but I disagree with him.

Further, the evidence shows that but one piece of grit, not larger than the eye of a small needle, and certainly not as large as the head of a pin, would have been sufficient to prevent the proper seating of the valve, which would have been a competent producing cause of the telemotor to function improperly, and there would have been no necessity for any considerable quantity to have been in the oil.

The size of the object which would prevent the seating of the valve would not have had to be larger than the eye of a small needle, and might have been an object caused by a combination of oil and dirt getting in under the valve seat, as it is closed with the springs which hold the valve.

 The failure not only to have the cover of the gravity tank in the pilot house closed, but in preventing its closing by the construction and maintenance of the vent pipe, and in allowing the vessel to commence her voyage under those conditions, and in allowing the vessel to sail with the holes in the strainer in the gravity tank in the pilot house, of the size and character hereinbefore described, and in the vessel sailing under those conditions, rendered the vessel unseaworthy, and showed that the owner had not used due diligence to render her seaworthy, and therefore it cannot claim the benefits of the exceptions of the bill of lading.

An error in navigation was the proximate cause of the damages to the cargo here in question, not damage due to water of any kind, perils of the sea, or latent defects in hull, machinery, or appurtenances, etc., as to which exemption is given by the bill of lading; therefore May v. Hamburg, etc., Gesellschaft, 290 U. S. 333, 54 S. Ct. 162, 78 L. Ed. 348, referred to as the Isis Case, is controlling authority, and I see no necessity for further enlarging this opinion.

The libelants are entitled to decrees against the steamship West Arrow and her owner American Diamond Lines, Inc., respondent in each of the above-entitled actions, with interest and costs, and the usual order of reference.

Decrees will be entered in accordance with this opinion. Settle decrees on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by rule 46½ of the Rules in Admiralty (28 USCA § 723), and the Admiralty Rules of this court.